This cause was heard upon the records in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellants, Richard Bolen ("Bolen") and Desiree King ("King"), appeal the decision of the Medina County Court of Common Pleas, Juvenile Division, terminating their parental rights and granting permanent custody of their two children, James and Selena, to Medina County Job and Family Services ("MCJFS"). This court affirms.
On February 2, 1999, Appellants placed James, born January 3, 1999, in voluntary temporary custody with MCJFS. Then, on February 11, 1999, MCJFS filed a complaint alleging that James was a dependent child. The trial court ordered that James be placed in the predispositional custody of Medina County Department of Human Services. On May 4, 1999, the trial court held a hearing for adjudication and disposition of the complaint where the court adjudicated the child dependent. Further, the court continued predispositional custody until May 21, 1999, after which time James was to be returned to the home and custody of Appellants with protective supervision.
On March 31, 2000, MCJFS moved the trial court to modify disposition from protective supervision to emergency temporary custody. The trial court denied the motion. Subsequently, MCJFS moved again for emergency temporary custody, which the trial court granted on April 25, 2000.
On October 13, 2000, MCJFS filed a complaint alleging that Selena, born October 10, 2000, was a dependent child. It also moved the court for an order of predispositional interim custody, pending a full hearing on the complaint. The trial court ordered that Selena be placed in the predispositional custody of Medina County Department of Human Services. The trial court ordered that MCJFS be granted emergency temporary custody of Selena. On October 16, 2000, the trial court held a hearing where it committed Selena to the predispositional custody of MCJFS. Further, it ordered that MCJFS submit a reasonable visitation plan which allowed Appellants reasonable visitation with Selena in the hospital, where she remained due to medical complications.
On December 12, 2000, MCJFS amended the complaint with regard to Selena to request permanent custody and termination of parental rights pursuant to Juv.R. 22(B). On January 16, 2001, MCJFS moved for modification of disposition from temporary custody to permanent custody of James.
On March 13-16, 2001, the trial court held hearings regarding the motions for permanent custody with regard to both Selena and James. Specifically, on the first day the trial court held an adjudicatory hearing with regard to Selena where it found that Selena was a dependent child. The hearing was continued as to disposition. There were no objections to the continuance and all parties had been served with necessary documentation. Following three days of testimony and evidence, the trial court ordered that James and Selena be committed to the permanent custody of MCJFS and terminated Appellants' parental rights to both children. Appellants separately appealed each decision and this court consolidated the appeals. Bolen has raised four assignments of error and King has raised two assignments of error, which have been rearranged and consolidated for ease of review.
 BOLEN'S ASSIGNMENT OF ERROR II The court committed reversible error by failing to bifurcate the adjudicatory and dispositional hearings.
In his second assignment of error, Bolen argues that the trial court erred by failing to bifurcate the adjudicatory and dispositional hearings. Specifically, Bolen contends that Juv.R. 29(F)(2)(a) and R.C.2151.35(A)(1) call for separate hearings. Bolen's assignment of error is without merit.
Juv.R. 29(F)(2)(a) states that if the allegations in the complaint are proven the court shall "[e]nter an adjudication and proceed forthwith to disposition[.]" Likewise, R.C. 2151.35(A)(1) provides that if the court finds that the child is dependent, the court "shall proceed * * * to hold a dispositional hearing and hear the evidence as to the proper disposition to be made under [R.C. 2151.353]."
Juv.R. 34(A) articulates, in relevant part, that "[t]he dispositional hearing may be held immediately after the adjudicatory hearing if all parties were served prior to the adjudicatory hearing with all documents required for the dispositional hearing and all parties consent to the dispositional hearing being held immediately after the adjudicatory hearing." Furthermore, Juv.R. 34(I) states that hearings held to determine whether temporary custody orders should be modified to permanent custody orders are considered dispositional hearings and "need not be bifurcated."
In the instant case, with regard to Selena, the trial court convened the adjudicatory hearing on March 13, 2001. The court found by clear and convincing evidence that Selena was a dependent child. According to the journal entry of April 6, 2001, the "[h]earing [on March 13, 2001] was continued as to disposition, there being no objections and all parties having been served with necessary documentation and discovery." Therefore, the trial court fully complied with Juv.R. 34(A).
In James' case, the trial court held a hearing on May 4, 1999, for adjudication and disposition of the complaint. The court adjudicated James a dependent child. On January 16, 2001, MCJFS moved for modification of disposition from temporary custody to permanent custody of James. Therefore, at the hearing on March 13-16, 2001, the trial court was addressing whether the temporary custody order for James should be modified to permanent custody. In accordance with Juv.R. 34(I), the trial court was not required to bifurcate in this instance. Bolen's second assignment of error is overruled.
 BOLEN'S ASSIGNMENT OF ERROR III The trial court erred when it held a dispositional hearing more than ninety days after the filing of the complaint.
Bolen's third assignment of error proposes that Selena's dispositional hearing was untimely because it was held more than ninety days after the complaint was filed, in violation of R.C. 2151.35(B)(1) and Juv.R. 34(A). We disagree.
Juv.R. 34(A) states, in relevant part:
 [T]he dispositional hearing shall not be held more than ninety days after the date on which the complaint in the case was filed. If the dispositional hearing is not held within this ninety day period of time, the court, on its own motion or the motion of any party or the guardian ad litem of the child, shall dismiss the complaint without prejudice.
See, also, R.C. 2151.35(B)(1).
This court previously held that "the statutory time for holding the dispositional hearing is not jurisdictional. A parent may waive the time requirement, which is designed to expedite the resolution of the matters that intrude upon the parent's right to the care and custody of her child." (Citations and footnote omitted). In re: Jones (May 2, 2001), Summit App. No. 20306, unreported, at 6. Therefore, the statutory ninety day limit for holding the dispositional hearing was subject to waiver by Appellants. See id.
In the case at bar, MCJFS filed the complaint alleging Selena to be a dependent child and seeking temporary custody on October 13, 2000. The trial court held a pretrial hearing on December 19, 2000, where it scheduled the adjudication and disposition hearings for March 13-16, 2001. In the trial court order journalized on April 6, 2001, from which Appellants appeal, the trial court judge memorialized that pretrial hearing as follows:
 A second pre-trial conference was held on December 19, 2000, at which time the Court scheduled adjudication and disposition to be had on March 12th through the 15th, 2001. All parties having waived time for completion of disposition due to the amended prayer and needed time for completion of discovery.
Accordingly, this court concludes that Appellants waived the statutory ninety day time limit. Bolen's third assignment of error is overruled.
 BOLEN'S ASSIGNMENT OF ERROR IV The trial court abused its discretion in granting permanent custody of the children.
 KING'S ASSIGNMENT OF ERROR II The trial court erred in its discretion to award permanent custody of the children to [MCFJS].
Bolen's fourth and King's second assignments of error assert that the trial court erred in awarding MCFJS permanent custody of their children. We disagree.
Termination of parental rights is an alternative of last resort, but is sanctioned when necessary for the welfare of a child. In re Wise (1994),96 Ohio App.3d 619, 624. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, who is neither abandoned nor orphaned, it must find by clear and convincing evidence that (1) the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E), and that (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C.2151.414(B)(2); In re William S. (1996), 75 Ohio St.3d 95, 99. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" Inre Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v.Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
When determining whether the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, the juvenile court must find by clear and convincing evidence that at least one of the enumerated factors in R.C. 2151.414(E) exists as to each of the child's parents. In re William S., 75 Ohio St.3d at 101. Those factors are:
 (1) Following the placement of the child outside the child's home * * *, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. * * * [;]
* * *
 (3) The parent committed any abuse as described in [R.C. 2151.031] against the child, caused the child to suffer any neglect as described in [R.C. 2151.03], or allowed the child to suffer any neglect as described in [R.C. 2151.03] between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
* * *
 (14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect[.]
R.C. 2151.414(E).
The juvenile court should consider all relevant evidence when making such a determination. Id. When a juvenile court finds by clear and convincing evidence that one of the enumerated factors in R.C. 2151.414(E) is present, the court must then conclude that the child cannot be placed within a reasonable time or should not be placed with the parent. In reThorn (Feb. 16, 2000), Summit App. No. 19597, unreported, at 8. "The clear import of [R.C. 2151.414(E)] is that it is mandatory on the court to decide that a child cannot be placed with his parent when any of the * * * conditions exist as to that parent. The intent of the legislature was to eliminate any discretion on the part of the court when one of the conditions exists." In re Higby (1992), 81 Ohio App.3d 466, 469.
The trial court in the present case specifically enumerated the above sections of R.C. 2151.414 as applicable to Appellants and set forth the facts that supported its findings. Witnesses who testified at the hearing included Eileen Mahdik-Morello, a psychotherapist; Dr. Laurel Aramo-Roach, Selena's pediatrician; Nancy Joy Huntsman, a psychologist employed by the Cuyahoga County Court of Common Pleas and Cleveland Municipal Court; Dr. Thomas L. Plesec, Ph.D., a licensed psychologist; Betty Rose, supervisor of the Community Resource Unit of MCJFS; Joyelle Lawrence, a case manager for the Medina County Board of Mental Retardation and Developmental Disabilities ("MR/DD"); Rebecca Smith, the first MCJFS caseworker assigned to the case; Julie Kubiak, the second MCJFS caseworker assigned to the case; Michelle A. Kiltaw, a friend of King and Bolen; Anne Louis Sklenar, Kiltaw's mother; Desiree King and Richard Bolen. Based on this testimony, the following evidence was established at the permanent custody hearing.
MCJFS established a caseplan to address risks to the children which required remedy in order to preserve the family. These initial and emergent concerns included infant nutrition of James, King's failure to bond with both children, King's lack of interaction with James, basic childcare skills, Bolen and King's mental and emotional illness, Bolen and King's ability to parent independently, proper discipline, anger and stress management, family conflict, failure to meet James' developmental needs, sexual abuse risk, exposure to high-risk individuals, lack of employment, Selena's special needs, and independent parenting of two children at different developmental levels.
MCJFS arranged for numerous services to be provided to Appellants in an effort to remedy these concerns. Most of the service providers visited Appellants in their home. Services scheduled and available through the time the trial court granted MCJFS permanent custody included, among other services, a mentoring mother, a mentoring father, a Young Mother's support group and educational program, a Red Cross volunteer, a representative from the Health Department through the WIC program, case management through MR/DD, protective daycare, and Early Head Start. MCJFS also scheduled counseling for King and Bolen separately and jointly, access to a job program, a therapy assessment, and a parenting assessment for Bolen.
James was returned to Appellants under protective custody when he was approximately four months old until he was removed a second time at the approximate age of fifteen months. During this time period a number of relevant incidents occurred with regard to Appellants' ability to care for and protect James. When James was approximately thirteen months old, according to King's testimony, she spanked him after she had put him to bed. She stated that she was fighting with Bolen at the time about whether James should go to bed. She felt she had to discipline James because Bolen wanted him to stay up. The act of so-called discipline left significant bruising on James' bottom which remained visible for longer than one day, even though he was wearing a diaper at the time of the spanking. Bolen reported the incident to the MCJFS caseworker three days later, only after he realized that a service provider would be visiting Appellants' home that day. King also testified that she disciplined James whenever he was "crabby."
When James was fourteen months old, an incident of neglect occurred, which King subsequently reported to her therapist, Mahdik-Morello. King left James alone in Appellants' apartment for at least one hour while he was napping. King had gone out to look for Bolen, who had left the apartment to drink alcohol with another woman. King relayed to Mahdik-Morello that she did not understand why leaving James alone in the apartment was dangerous behavior.
Also during this time, Appellants continually exposed James to high-risk individuals. For example, Bolen and King allowed family friends, the Firises, to discipline James. Specifically, on one occasion Mrs. Firis slapped James for spitting out his food. Appellants did not address the incident with Mrs. Firis and, further, continued to socialize with the Firises. The relationship with the Firises ultimately resulted in a court order of restraint.
Additionally, Bolen's stepfather, Danny Crowe, indecently exposed himself to James. Crowe allegedly has a history of sexually abusing Bolen, including an incident which occurred as recent as December 1999. King testified that Crowe was smoking marijuana and drinking alcohol at the time. She also stated that Crowe gave beer to James. Neither Bolen nor King addressed the incident with him, nor did they report the episode to authorities.
The final incident, after which James was removed from the home a second time, occurred while Bolen was changing James' diaper. Bolen reported to his caseworker that he became nervous and short of breath while changing the diaper. He had flashbacks of childhood sexual abuse and was fearful the same thing would happen to James. Bolen also conveyed that he felt like he wanted to tickle James, but was afraid it would go further.
Six months after James was placed into temporary custody the second time, King gave birth to Selena. Selena was born with numerous medical needs, which require a very high level of care, according to her pediatrician, Dr. Roach. Notably, she suffers from respiratory difficulties, a failure to thrive, an unidentified genetic syndrome, seizures, and a heart disorder for which she has had surgery. Also, due to feeding difficulties she is fed through a nasogastric tube, which requires frequent monitoring. Selena is monitored by an apnea machine and there is some question as to whether she has sight in her left eye. She requires the administration of numerous medications on a daily basis. MCJFS moved for temporary custody of Selena three days after her birth while she was still hospitalized, based on concerns surrounding previous involvement with the family in regard to the neglect and abuse of James. The trial court ordered that Selena be placed in the temporary custody of MCJFS before she was discharged from the hospital.
Appellants were offered 160 hours of visitation with Selena while she was hospitalized during the first ten days of her life. Bolen and King took advantage of only six of those available hours. From November 7-16, 2000, Selena was hospitalized a second time. Due to her fragile medical condition the trial court allowed visits for only three days for one half-hour each and ordered that there be no touching. Bolen and King did not visit during this time. From January 12-16, 2001, Selena was hospitalized again after undergoing cardiac surgery. Appellants were allowed eight hours of visitation. King took advantage of one hour, while Bolen did not visit, claiming he did not know he was allowed. Testimony indicated that when Appellants did visit Selena, it involved "minimal holding," even though it was offered. Furthermore, there was no eye contact or smiling and no touching, when it was allowed.
Regarding visitation with James, testimony established that in the month of September 2000, either King, alone, or Appellants jointly attended six of nine available visits. Bolen attended none individually. During October 2000, Appellants took advantage of four of eleven available visits, with King attending one visit alone and both parents attending three visits jointly. With regard to the eight unattended visits in October, Appellants cancelled five of them and did not appear for three, without explanation. In November 2000, ten visits were available. Appellants did not visit that month. They cancelled seven of the appointments and did not appear for three of them, without explanation. From December 1-8, four visits were available. Appellants did not visit that week. On December 8, 2000, MCJFS sent a letter to Appellants stating that transportation could no longer be provided to James, due to lack of visitation; however, Appellants were told they could call to reinstate and schedule more appointments. On January 26, 2001, Bolen and King attended a visit that had been requested by Bolen. This was Appellants' last visit with their son prior to the hearing in March 2001. Although King requested and scheduled two more visits in February 2001, neither parent attended.
Appellants stated that their lack of visitation was due to a lack of transportation. However, according to testimony from various witnesses, they had friends from whom they could have requested and received help. More importantly, Bolen had received 24 vouchers for free public transportation he received from MR/DD, of which he utilized only four.
Testimony indicated that when King did visit with James she did not interact with him, nor express affection, even with instruction from caseworkers. Specifically, during the visits King would sit and either write in a notebook or look out the window. For example, during her last visit with James, King was sitting on a couch and writing in her notebook when James approached her. He placed his head on her lap on top of the notebook. King proceeded to pull the notebook out from under his head and continued writing. The testimony showed that there was no change in her behavior regarding the initial concerns of a lack of bonding and interaction with James.
Even after James' and Selena's removal, Appellants continued to expose the family to high-risk individuals. Appellants allowed "Johnny," a friend of a friend, to move in with them for approximately two to three months. Testimony showed that Johnny threatened King with a knife and Appellants continued to allow him to live with them. Also, there was testimony that indicated that Appellants eventually moved in with friends in order to get away from Johnny, who continued to live in Appellants' apartment. Likewise, Appellants permitted a man named Mike Burnette to stay with them. Burnette allegedly sexually abused Bolen, but Appellants allowed him to continue to stay with them. This further evidences the continued exposure of the family to high-risk individuals and the inability to protect the family from this behavior. Also, testimony indicated that police had been called to Appellants' home on a number of occasions due to violence between King and Bolen and a suicide threat made by King.
A number of psychologists testified as to Appellants' behavior and progress in therapy sessions. Additionally, the two caseworkers assigned to the case testified as to Appellants' progress with the caseplan. With regard to King, the testimony and evidence demonstrated that although she improved her basic childcare skills and made some progress in therapy, there was no improvement on the remaining issues. King failed to complete the required therapy sessions and ended the therapy before treatment was complete. Further, King was found to be incapable of identifying all the issues necessary to protect and parent a child. Although she was found to have some ability to parent, King had difficulty in coming up with her own plan to parent a child. She failed to follow through with the skills taught to her by the various service providers. Although MCJFS offered King opportunities to obtain employment, she failed to follow through with the services.
Bolen also ended his therapy early and was subsequently referred to counseling many times, but failed to follow through. He also unilaterally decided to quit taking medication prescribed for his psychological problems. It was reported that Bolen was able to manage his own affairs and make his own decisions "in the minimum fashion." However, various psychologists described Bolen as an individual that is resistant to change and repeats behaviors that do not work; has difficulty recognizing or anticipating a threat and encounters further difficulty in figuring out the appropriate action to take in response; and manifests numerous difficulties in functioning. Bolen failed to follow through with services that were made available to him to obtain employment. There were also services that Bolen failed to use, including services to aid him with employment and transportation. Jointly, Bolen and King also attended some therapy sessions in order to improve their relationship. It was reported that they made very minimal progress toward that goal due to problems with King's grief and anger.
At the time of the permanent custody hearing, all the initial and emergent issues which caused James and Selena to be placed outside the home had yet to be remedied, excluding the concern regarding basic childcare skills, which had improved. The evidence and testimony presented at the hearing supported the trial court's finding that King had abused and neglected James and that both King and Bolen had failed to prevent the child from suffering emotional and sexual abuse. The testimony demonstrated that King and Bolen demonstrated a lack of commitment toward James and Selena by failing to regularly visit with them when able to do so.
Based on the foregoing, we find that there was clear and convincing evidence for the trial court to find that these children could not be placed with either parent within a reasonable time. R.C. 2151.414(B)(2).
When determining whether a grant of permanent custody is in the child's best interest, the juvenile court should:
[C]onsider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed * * * through the child's guardian ad litem[;]
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 For the purposes of this division, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.
R.C. 2151.414(D)(1)-(5).
James was twenty-six months old at the time of the permanent custody hearing. The record indicates that he has been in the temporary custody of the agency for approximately fourteen months of the consecutive twenty-six month period, over half his life.
As previously discussed, King's lack of interaction and bonding with James remained an unremedied risk throughout this case. With regard to Bolen, it was reported that he bonded properly with James, but that he improperly intervened and interacted with him during visits. The children's guardian ad litem described Bolen's interaction with James during the visits as "a child playing with a child." More importantly, the visitations decreased and became virtually nonexistent after October 2000. Specifically, King and Bolen visited James on only one occasion between October 2000 and the hearing in March 2001, with at least sixteen missed or cancelled appointments in between. The guardian ad litem
reported that James does not have a strong relationship with any other relative or friend of the family. His closest connection is with his foster family.
Testimony indicated that James was progressing quite well in his foster home. Representatives from MCJFS described James as an active two-year-old who walks, talks, expresses affection and possesses the ability to bond. At the time of the hearing, a representative from the agency stated that James did not appear to have any developmental delays.
Selena was seventeen months old at the time of the permanent custody hearing. The record demonstrates that the trial court placed her in the custody of MCJFS when she was three days old and still hospitalized. She has remained in foster care since that time. Given Bolen and King's lack of visitation with Selena, there has been virtually no interrelationship of Selena with her parents. It was also reported that the visits they did attend evidenced a lack of interaction with the child. This is further supported by the children's guardian ad litem who stated that Selena has no bond with her parents.
Selena's foster mother is a registered pediatric nurse, employed by Children's Hospital. She also works with terminally ill children. A visiting nurse comes into the foster home when the foster mother has to go to work. Selena's pediatrician testified that Selena recognizes her foster mother and appears to have bonded with her.
The children require a legally secure placement. The parents have been provided services since James' birth, but have failed to remedy the abundant risks and concerns. MCJFS explored relatives as a possible placement for James. The agency found that King's grandmother was an inappropriate placement since she was not willing to protect James from her son, a convicted sex offender, with whom she lived. Bolen's mother and grandmother were not interested in caring for the children. Additionally, the agency investigated Bolen's cousin, but he subsequently passed away. MCJFS also investigated Appellants' friends, Michelle Kiltaw and her husband, Frank, as a possible placement for both Selena and James at the request of Appellants. The agency found that the Kiltaws were an inappropriate placement, due to the agency's extensive involvement with the family regarding significant issues of neglect and possible abuse in the family. There were no other potential kinship placements available for either child.
The children's guardian ad litem recommended that permanent commitment was in the children's best interest. In her report to the trial court she stated as follows:
 The children need caregivers who are able to adequately adapt to their changing needs. Even though the parents somewhat complied with the case plan, they have not been able to remedy the situation or concerns of the children. The parents have failed to show they are able to analyze a problem or concern, make an appropriate choice and implement a plan of action. Without the parents able to correctly process the parenting techniques of both children and medical necessities of Selena, these children are not secure in their care.
Accordingly, upon review of the evidence, the trial court's determination that it was in the children's best interests that they be placed in the permanent custody of MCJFS was supported by substantial evidence. Since there was substantial evidence to support that the children could not be placed with either parent within a reasonable time and that it was in the children's best interests to grant permanent custody to MCJFS, the trial court did not abuse its discretion in granting permanent custody to MCJFS under R.C. 2151.414(B)(1). Bolen's fourth assignment of error and King's second assignment of error are without merit.
 BOLEN'S ASSIGNMENT OF ERROR I The court committed reversible error when it failed to appoint guardians ad litem for [Bolen] and [King].
 KING'S ASSIGNMENT OF ERROR I The trial court erred in not appointing a guardian ad litem for [King].
In Appellants' first assignments of error, they maintain that the trial court committed plain error in failing to sua sponte appoint a guardianad litem for Bolen and King. We disagree.
Initially, we note that neither Bolen nor King requested that the trial court appoint them a guardian ad litem. Accordingly, they have waived this issue on appeal in the absence of plain error. In re Smith (1990),64 Ohio App.3d 773, 780; In re Christian (Dec. 1, 1999), Summit App Nos. 19222 19223, unreported, at 9. Unless the error is plain error, seriously affecting the basic fairness of the judicial process, such error will not be reversed on appeal. See Chaney v. Beard-Chaney (July 16, 1998), Cuyahoga App. No 73009, unreported, 1998 Ohio App. LEXIS 3296, at *5, citing Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, syllabus.
Juv.R. 4(B) provides in relevant part:
 The court shall appoint a guardian ad litem to protect the interests of a child or incompetent adult in a juvenile court proceeding when:
* * *
 (3) The parent is under eighteen years of age or appears to be mentally incompetent[.]
R.C. 2151.281 provides as follows:
 (C) In any proceeding concerning an alleged or adjudicated delinquent, unruly, abused, neglected, or dependent child in which the parent appears to be mentally incompetent or is under eighteen years of age, the court shall appoint a guardian ad litem to protect the interest of that parent.
"Juv.R. 4(B)(3) and R.C. 2151.281 mandate that the court appoint a guardian ad litem to protect the interests of an incompetent adult in a juvenile proceeding where the parent appears to be mentally incompetent."In re Baby Girl Baxter (1985), 17 Ohio St.3d 229, 232. While an adult in a juvenile proceeding may appear to be mentally impaired, that does not mean that he or she is mentally incompetent. In re Luzader (Dec. 3, 1997), Summit App. No. 18282, unreported, at 4. Even when an adult is mentally retarded, that fact, in itself, is not enough to support a claim of incompetence. State v. Settles (Sept. 30, 1998), Seneca App. No. 13-97-50, unreported, 1998 Ohio App. LEXIS 4973, at 9, citing Penry v.Lynaugh (1989), 492 U.S. 302, 106 L.Ed.2d 256. Furthermore, the failure to appoint a guardian ad litem does not constitute reversible error where no request for a guardian ad litem is made or the party cannot show prejudice. See, e.g., In re McMunn (Jan. 24, 1990), Hocking App. No. 88 CA 8, unreported, 1990 Ohio App. LEXIS 390, at *12.
Dr. Thomas L. Plesec, a licensed psychologist, evaluated Bolen in 1998 and King in 1999. He testified that based on his assessments they both were functioning within the mentally retarded range. Testimony from other witnesses indicated that Bolen had also been diagnosed as "mildly retarded" and King had been described as "borderline retarded." These mental impairments are insufficient to support a finding that Bolen and King were mentally incompetent. In re Luzader, supra, at 4; Settles,supra, at 9.
Even if the trial court's failure to sua sponte appoint a guardian adlitem constituted error, Bolen and King are required to show that they were prejudiced by that error. In an effort to show he was prejudiced, Bolen merely states in his appellate brief that the failure of the trial court to appoint him a guardian ad litem "rises to the level of plain error which results in prejudice[.]" However, an alleged error is not prejudicial for purposes of plain error review unless, "but for the error, the outcome of the trial clearly would have been otherwise." Statev. Long (1978), 53 Ohio St.2d 91, paragraph two of the syllabus. Bolen has failed to show how the outcome of the trial would have changed had he been appointed a guardian ad litem. Therefore, he has failed to establish how he was prejudiced by this alleged error.
King contends that the trial court's failure to appoint her a guardianad litem prejudiced her because she required a guardian ad litem to assist her in managing the many services provided through MCFJS pursuant to the caseplan. She also argues that she was in need of a guardian adlitem to adequately explain to her Selena's prognosis and special needs.
The purpose of a guardian ad litem is to secure for the incompetent person a proper defense or an adequate protection of his or her rights. See In re Height (1975), 47 Ohio App.2d 203, 206. Further, a guardian adlitem is appointed to protect the ward's interest and acts for her benefit. Baxter, 17 Ohio St.3d at 232. A guardian ad litem is an officer of the court and must be distinguished from a general guardian who has the general care and control of the person. In re Etter (1998),134 Ohio App.3d 484, 490.
As discussed in Bolen's fourth assignment of error and King's second assignment of error, evidence was presented that King did not comply or follow through with the skills taught to her in the various programs provided through MCJFS. There was testimony that indicated that King did not cooperate with the mentoring mother assigned to aid her in improving her childcare skills. Furthermore, there was testimony demonstrating that after James was returned to Appellants, King continued to expose him to high-risk individuals, failed to obtain employment as required, and failed to continue with her counseling to address her mental and emotional illnesses. Additionally, King's lack of bonding with her children, lack of visitation with her children, and inappropriate discipline methods did not improve.
Although King argues that appointing an officer of the court would have permitted her to manage the various services, she fails to establish how that same officer of the court would have enabled her to learn the appropriate skills from the various services, apply those skills to raising her children, cooperate with the service providers, reduce James' exposure to high-risk individuals, obtain employment, follow through with counseling, and create the desire to bond and visit with her children. Therefore, King has failed to demonstrate how appointing a guardian adlitem would have changed the outcome of the trial.
Appellants failed to request that a guardian ad litem be appointed, demonstrate an appearance of incompetence, or establish resulting prejudice. Therefore, we are unable to justify invoking the doctrine of plain error under these circumstances. Bolen and King's first assignments of error are overruled.
Bolen's first, second, third, and fourth assignments of error are overruled. King's first and second assignments of error are overruled. The judgment of the trial court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
LYNN C. SLABY, BATCHELDER, P.J., CARR, J. CONCUR.